# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

## INTRODUCTION

Jay Bellich, your affiant, a Special Agent with the Drug Enforcement Administration ("DEA"), Denver, Colorado, being duly sworn states as follows.

1. Your affiant is an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7) and is authorized by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Your affiant is also "federal law enforcement officer" within the meaning of Fed.R.Crim.P. 41(a)(2)(C) and can apply for a Search Warrant pursuant to this rule.

2. Your affiant submits this affidavit in connection with an application seeking authorization to search:

    (a) the property known and described as 3255 S. PARKER ROAD, AXIS AT NINE MILE STATION APARTMENTS DENVER, APARTMENT 1502, DENVER, COLORADO, 80014, (hereinafter the "SUBJECT PREMISES" which is described fully in Attachment A);

and thereupon to seize evidence of criminal activity described in detail in Attachment B.

## BACKGROUND OF YOUR AFFIANT

3. Your affiant is a Special Agent with the Drug Enforcement Administration (DEA) assigned to the Drug Enforcement Administration Organized Crime Drug Enforcement Task Force Strike Force Group. Your affiant's primary duties include the investigation of all drug-related criminal activity and all crimes associated with drug trafficking, including weapons violations.

1

4. Your affiant is employed as a Special Agent with the DEA and has been so assigned since March 2016. Your affiant is in the process of and has received training in conducting drug investigations. Specifically, your affiant has initiated, developed, and participated in a variety of drug investigations that have included the following: Title III Intercepts, undercover operations, marijuana cultivation, clandestine methamphetamine distribution, and interdiction operations. Your affiant has attended numerous training courses pertaining to the above-listed drug investigations.  Your affiant has further participated in investigations involving offenses of distribution of and possession with intent to distribute narcotics.

5. Your affiant is familiar with many commonly abused drugs, including cocaine, heroin, LSD, marijuana, ecstasy, GHB, PCP, and methamphetamine; their appearance, methods of use, manufacturing, distribution, packaging and concealment; and slang terms frequently used to refer to these drugs and things closely related to their use and distribution.

6. Your affiant's training and experience as a Special Agent includes, but is not limited to, conducting electronic and physical surveillance, interviewing informants and witnesses, writing affidavits, executing search warrants and arrest warrants, participating in wiretap investigations, reviewing telephone records, and reviewing taped conversations. Your affiant is experienced in the means and methods used by people and drug trafficking organizations to communicate, purchase, transport, store, and distribute drugs, as well as the means and methods used to conceal profits generated from those transactions.

7. Your affiant has participated in this investigation since approximately January 2019. As a result of this investigation, statements made to your affiant by other law enforcement personnel, a review of reports made by police officers/agents, and statements made by

Confidential Source (s) ("CS"), your affiant is familiar with the facts and circumstances of this investigation.

8. During the course of this investigation, investigators have obtained information from official law enforcement files, federal, state, and local law enforcement officers and agents, surveillance activities, public and other investigative techniques which are detailed below.

9. Because this affidavit is being submitted for the limited purpose of securing a search warrant, your affiant has not included details of every aspect of the investigation to date. Facts not set forth herein are not being relied on in reaching your affiant's conclusion that an Order should be issued. Nor does your affiant request that this Court rely on any facts not set forth herein when determining whether a warrant should issue.

10. Based on your affiant's training, experience and investigations involving large amounts of heroin, cocaine, methamphetamine, and other controlled substances, your affiant knows that:

    a. Drug traffickers often maintain on hand or have immediate access to large amounts of United States currency in order to maintain their ongoing narcotics business. The sale and distribution of controlled substances requires an inventory that is expensive. Controlled substance sales often generate large cash proceeds, which lead to currency reporting to Federal authorities. The currency reporting requirements limit the traffickers ability to make unreported cash purchases and convert cash into other monetary instruments;

    b. Illegal drug trafficking has many similarities to legitimate business activities. In general, a business generates business records, business expenses, generally relate to business purposes, and a related paper trail reflecting the business activities. Dealers in controlled substances often maintain books, records, receipts, notes, ledgers, airline tickets,

money orders, and other papers relating to the transportation, ordering, possession, sale and distribution of controlled substances. Controlled substance traffickers frequently or commonly "front" (provide narcotics on consignment) to their clients and sub-distributors. The aforementioned books, records, receipts, notes, ledgers, etc., are maintained frequently where the methamphetamine, cocaine and/or other controlled substance traffickers have ready access to them;

      c.      It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their associates' residences, on their property, in their automobiles, in their businesses or in safe deposit boxes at financial institutions for ready access and to conceal them from law enforcement authorities;

      d.      Illegal drug trafficking operates as a black market industry. Persons involved in drug trafficking often conceal in their residences, their associates' residences, their automobiles, on their property, associated businesses and safe deposit boxes, caches of drugs, large amounts of currency, financial instruments, jewelry, expensive clothing, furniture and other items of value which are the proceeds of drug transactions and evidence of consequential financial transactions related to obtaining, transferring, secreting, or spending of large sums of money made from engaging in narcotics trafficking activities;

      e.      Drug dealers often keep keys, rental receipts, ownership deeds and certificates, and billing information that indicate where methamphetamine, cocaine and/or other controlled substances, assets from their dealings, and related documents are secreted in their residences, associates' residences, automobiles, businesses, and safe deposit boxes;

      f.      Controlled substance traffickers commonly maintain addresses and/or

telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates, customers, sub-distributors, and sources in their trafficking activity;

        g.     Drug traffickers often maintain firearms associated with their drug trafficking activities. Drug traffickers need to provide their own protection from rival drug traffickers, drug customers and persons interested in robbing or "jacking" cash proceeds and valuable inventories of illegal controlled substances; and

        h.     Illegal drug traffickers often use various communications technologies to further their business activities, including E-Mail and voice communications. Computer equipment is sometimes utilized in certain narcotics operations, as are cellular telephones, Blackberry-type communications devices, pagers, and telephone answering machines.

11.     Based on the information obtained to date, your affiant believes that probable cause exists to search the SUBJECT PREMISES for, and thereupon to seize admissible evidence of violations of the United States Code, including, but not limited to, violations of Title 21, United States Code, Section 841(a)(1), Possession with Intent to Distribute and Distribution of a Controlled Substances.

## PROBABLE CAUSE FOR SEARCH LOCATIONS

**A.**     **Information Indicating the Subject Premises is Being Used for Drug Trafficking**

12.     Beginning in January of 2019, a DEA confidential source, (hereinafter the "CS") relayed information to your affiant about a suspected poly-drug trafficker operating in the Denver area. The information indicated that an individual named Justin WALKER is selling methamphetamine, cocaine, heroin, LSD, and ketamine out of his apartment at 3255 S. Parker Rd. #1502, Denver, Colorado, 80014 (the "SUBJECT PREMISES"). The CS also stated that he/she has seen approximately five pounds of methamphetamine, a half a kilogram of cocaine,

six ounces of heroin, some "acid", ketamine and mescaline in the SUBJECT PREMISES. The CS also stated that WALKER has a Ring doorbell camera and another camera mounted with a view down the hall to the elevator. The CS continued to explain that he/she has seen multiple weapons including handguns and an AR rifle with a scope in the SUBJECT PREMISES.

**B.    Identification of Justin WALKER**

13.    Justin S. WALKER, DOB: 12/07/1977, FBI#: 407145XA0, holds CO DL # 070090631 at 4760 S. Wadsworth Blvd., Apt. J205, Lakewood, CO. A search of criminal history record indicated WALKER has been arrested in Colorado, Florida, and New York for possession of a weapon, probation violation, amphetamine possession, theft, cocaine possession, tampering with evidence, assault, burglary, possession of narcotic equipment, possession of drug paraphernalia, dealing in stolen property, criminal sale of controlled substance, possession of contraband in prison, possession of hypodermic instrument, shop lifting, possession with intent to distribute schedule II and IV controlled substances.

14.    In February 2019, following up on the information from the tip, your affiant went to the SUBJECT PREMISES. Your affiant describes the SUBJECT PREMISES as follows: a seven-level, blue/grey, apartment building located in the Axis at Nine Mile Station Apartment Complex. Looking at the front of the apartment building, there is a main lobby entrance on the left hand side of building 1 that connects to building 2. Entry through the main lobby glass doors leads to a lobby that splits buildings 1 and 2. Apartment 1502 is located in building 1, on the 5th level, on the left-hand or west side of the building. Apartment 1502 is clearly marked with a plaque to the left of the door.

**C.    February 2019 Controlled Purchase at the SUBJECT PREMISES**

15. During the week of February 11, 2019, CS agreed to participate in a controlled purchase of methamphetamine from WALKER at your affiant's request. The CS agreed to purchase a predetermine amount of methamphetamine at a predetermined price. The CS has a criminal record to include, but not limited to, methamphetamine possession with intent. The CS has also worked for other law enforcement offices in the capacity of a CS. While working for one group, the CS was caught transporting marijuana. In addition, the CS has previously worked as a CS for another DEA office. Those DEA controlling agents relayed that the CS had proven to be reliable resulting in drug related arrests and seizures. To date, the CS has never been known to give false information while working in Denver.

16. Before the purchase, investigators met with the CS at a predetermined location and searched the CS and the CS' vehicle for drugs, money, contraband and weapons and none were located.

17. The CS placed a controlled phone call in the presence of your affiant to Justin WALKER. During the call, the CS said, "Hi" and asked if he/she can "pull up," requesting to come over to WALKER's apartment. WALKER indicated it was okay for the CS to come to WALKER's apartment. The CS then said that his/her guy needs it, meaning that his/her customer wanted the methamphetamine. Both the CS and WALKER then said, "all right," and the call then ended.

18. Investigators then affixed the CS with one or more electronic monitoring devices to record the anticipated controlled purchase and to provide the CS with a margin of safety. Investigators provided the CS with Official Advanced Funds, OAF, to purchase a predetermined amount of methamphetamine.

19. Your affiant and SA Fralick followed the CS to the SUBJECT PREMISES. Your affiant and SA Fralick maintained visual contact with the CS from the predetermined meet location until TFO Wilson observed the CS enter the parking lot. TFO Wilson maintained visual contact with the CS from when the CS entered the parking lot of 3255 S. Parker Rd., to when the CS entered the elevator of building 1. Video surveillance confirms that the CS exited the elevator and went directly to apartment 1502.

20. A short while later, video surveillance confirms that the CS exited apartment 1502 and took the stairs down to the first floor hallway at which time TFO Wilson picked up visual surveillance of the CS. TFO Wilson observed as the CS exited building 1 and entered his/her vehicle in the parking lot. TFO Wilson then observed the CS drive through the parking lot out of TFO Wilson's view, at which time your affiant and SA Fralick followed the CS to a pre-determined meet location. Based on investigators' visual observations and video surveillance, the CS did not meet with anyone prior to entering the SUBJECT PREMISES. Additionally, based on investigators' visual observations and video surveillance, the CS did not meet with anyone after exiting the SUBJECT PREMISES and returning to the predetermined meet location.

21. Upon arriving at the predetermined meet location, the CS handed your affiant a clear plastic bag containing clear/white crystal-like substance, which your affiant recognized based on my training and experience as being consistent with methamphetamine. Later that day, the methamphetamine tested presumptively positive for the presence of methamphetamine. Your affiant retrieved the electronic audio and video surveillance device(s) from the CS. Your affiant, SA Fralick, and TFO Wilson again searched the CS and the CS' vehicle for drugs, money, contraband and weapons and none were located. Surveillance at the SUBJECT PREMISES subsequently ended.

22. Your affiant and ATF SA Larry Mims then debriefed the CS on the controlled purchase. The CS stated the following: the CS rang the doorbell to SUBJECT PREMISES and Justin WALKER answered the door. The CS said he/she needed the predetermined amount of "clear" and confirmed the price again. The CS then paid WALKER the predetermined amount of U.S. currency and WALKER gave the CS the predetermined amount of methamphetamine. The CS noted that he/she saw a handgun and a .22 caliber rifle with a silencer next to WALKER's bed. The CS then left the apartment. The CS also stated that WALKER had previously said he carries a gun because he is not going back to jail for life. After the debrief, the CS was released.

**D.     March 2019 Controlled Purchase at the SUBJECT PREMISES**

23. During the week of March 18, 2019, CS agreed to participate in a controlled purchase of methamphetamine from WALKER at your affiant's request. The CS agreed to purchase a predetermined amount of methamphetamine at a predetermined price.

24. Before the purchase, investigators met with the CS at a predetermined location and searched the CS and the CS' vehicle to ensure the CS was free of any drugs, money, contraband and weapons. The CS had an undetermined amount of money on him/her which investigators held onto until the completion of the controlled purchase.

25. The CS placed a controlled phone call in the presence of your affiant to Justin WALKER. During the call, the CS asked WALKER if he was up. WALKER responded affirmatively. The CS then stated that there isn't going to be parking, and he/she was going to run up and explained he/she just needed 2 of the "clear," referring to methamphetamine. WALKER clarified that the CS wanted "K," believed to be referring to ketamine, and asked if that is it. The CS replied affirmatively. WALKER then asked if the CS was sure and told the CS to bring way more cash because WALKER was going to talk the CS into buying more. Both

parties laughed. The CS then said he/she will be there in 2 seconds and didn't want his/her car towed. The CS and WALKER said goodbye and the call subsequently ended.

26. Upon review of the recorded call, it is believed that WALKER mistook the CS' request for "clear" for "K". In addition, it is believed that WALKER intended to try and sell the CS more drugs in addition to the predetermined amount of methamphetamine.

27. Investigators then affixed the CS with one or more electronic monitoring device(s) to record the anticipated controlled purchase and to provide the CS with a margin of safety. Investigators provided the CS with Official Advanced Funds, OAF, to purchase a predetermined amount of methamphetamine.

28. Your affiant and SA Fralick followed the CS to 3255 S. Parker Rd., Denver, CO., 80014. Your affiant and SA Fralick maintained visual contact with the CS from the predetermined meet location until TFO Tony Collett observed the CS enter the parking lot. TFO Collett maintained visual contact of the CS from when the CS entered the parking lot of 3255 S. Parker Rd., to when the CS entered building 1 of 3255 S. Parker Rd. At which time TFO Wilson established visual contact with the CS. TFO Wilson maintained visual contact of the CS from when the CS entered building 1 to when the CS entered the stairwell. Video surveillance confirms that the CS exited the stairwell and went directly to apartment 1502.

29. A short while later, video surveillance confirms that the CS exited apartment 1502 and took the stairs down to the first floor hallway at which time TFO Wilson picked up visual surveillance of the CS. TFO Wilson observed as the CS exited building 1. At which time, TFO Collett observed the CS enter his/her vehicle in the parking lot. TFO Collett then observed the CS drive through the parking lot out of Collett's view, at which time your affiant and SA Fralick followed the CS to a pre-determined meet location. Based on investigators' visual observations

and video surveillance, the CS did not meet with anyone prior to entering 3255 S. Parker Rd., #1502, Denver, CO., 80014. Additionally, based on investigators' visual observations and video surveillance, the CS did not meet with anyone after exiting 3255 S. Parker Rd., #1502, Denver, CO., 80014 and returning to the predetermined meet location.

30. Upon arriving at the predetermined meet location, the CS handed your affiant a clear plastic bag containing clear/white crystal like substance, which your affiant recognized based on my training and experience as being consistent with methamphetamine. Later that day, the methamphetamine tested presumptively positive for the presents of methamphetamine. Your affiant retrieved the electronic audio and video surveillance device(s) from the CS. Your affiant, SA Fralick, and TFO Wilson again searched the CS and the CS' vehicle for drugs, money, contraband and weapons and none were located. The money that investigators held onto for the CS was returned to the CS at this time. Surveillance at the SUBJECT PREMISES subsequently ended.

31. Your affiant and ATF SA Larry Mims then debriefed the CS on the controlled purchase. The CS stated the following: The CS rang the doorbell to SUBJECT PREMISES and Justin WALKER answered the door. WALKER had a bag of ketamine ready for the CS. The CS explained he/she wanted methamphetamine. The CS then paid WALKER the predetermined amount of U.S. currency and WALKER gave the CS the predetermined amount of methamphetamine. The CS noted that he/she saw a rifle style gun next to the front door of the apartment. The CS then left the apartment. After the debrief, the CS was released.

### D.   Entry Prior to 6:00 a.m. and No Knock Entry Request

32. It is believed that a no knock entry is the safest means of executing this warrant. Based on WALKER's criminal history, to include, but not limited to, possession of weapons

charges, distribution of controlled substance charges, and assault charges, it is believed that knocking and announcing would be dangerous to officers. In addition, based on intelligence that WALKER has multiple weapons out, staged and readily available for use, it is believed that knocking and announcing before entry creates a danger for officers. Furthermore, based on intelligence that WALKER has multiple types and quantities of drugs stashed inside the SUBJECT PREMISES, it is believed knocking and announcing before entry would inhibit the investigation by permitting destruction of evidence. Furthermore, because WALKER has multiple guns staged around his apartment, it is believed entry prior to 6:00 a.m. is safer for officers and parties inside the apartment. Based on the aforementioned facts, your affiant is requesting an entry prior to 6:00 a.m. and a no knock entry.

## CONCLUSION

33.     Based on the above-described information, your affiant states that there is probable cause to search the SUBJECT PREMISES further described in Attachment A and thereafter to search for and seize items described in detail in Attachment B. Furthermore, your affiant states there is reasonable suspicion to believe that entry after 6:00 a.m. and knocking and announcing before entry to the SUBJECT PREMISES would be dangerous to officers and would inhibit the investigation by permitting destruction of evidence.

I, Special Agent Jay Bellich, DEA Strike Force, having signed this affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Dated this 25th day of March, 2019, at Denver, Colorado.

*s/Jay Bellich*
Jay Bellich
Special Agent, DEA

Sworn to and subscribed before me this 25th day of March, 2019.

THE HON. SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE
JUDGE UNITED STATES DISTRICT
COURT DISTRICT OF COLORADO

**This affidavit was reviewed and submitted by Justin DeRosa, Assistant United States Attorney.**

13